(48 South. 927.)

No. 17,101.

CAMP v. BALDWIN–MELVILLE CO. et al. (Feb. 15, 1909. Rehearing Denied March 29, 1909.)

1. CUSTOMS AND USAGES (§ 14*)—ADDING TO TERMS OF CONTRACT.

· Where, in a contract of employment, a definite term is agreed on, evidence as to usage

123 LA.—9

in similar cases is irrelevant and inadmissible, since, the contract being lawful, usage cannot be substituted for the will of the parties.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 29 ; Dec. Dig. § 14.*]

2. CUSTOMS AND USAGES (§§ 14, 19*)—ADDING TO TERMS OF CONTRACT—EVIDENCE—SUFFICIENCY.

A theatrical manager having telegraphed to an actor, "Telegraph, here, lowest salary for next season, opening about September first, possible," and the actor having replied, stating his terms, and the manager having telegraphed again, offering somewhat less than the amount demanded, and adding, "If accepted, consider yourself engaged; answer, here, without fail, to-night," and the actor having answered, accepting the offer, held, that the engagement was for the season, and that evidence tending to show usage, among theatrical people, whereby there should be read into the contract a stipulation giving to either party the right to terminate the relation resulting therefrom, on giving the other two weeks' notice, was irrelevant and inadmissible. Held, further, that the evidence (which was admitted, though, as subsequently held, improperly) fails to show any such usage applicable to the case stated.

· [Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. § 29 ; Dec. Dig. §§ 14, 19.*]

3. MASTER AND SERVANT (§ 42*)—WRONGFUL DISCHARGE—OTHER EMPLOYMENT.

Where an actor, employed for the season, is discharged without cause before the close of the season, the fact that he may elsewhere earn money during the unexpired term of his contract has no bearing, under the law and jurisprudence of this state, upon his right to recover his salary for such unexpired term.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 42.*]

4. APPEAL AND ERROR (§ 173*)—PRESENTATION AND RESERVATION OF GROUNDS OF REVIEW—QUESTIONS NOT RAISED BELOW.

Where, in a cause in which there are two parties defendant, an agreement is entered into, in advance of the trial, to the effect that, quoad the plaintiff, the defendants, if liable at all are liable in solido, and shall be so condemned, without prejudice to their rights inter sese, and, pending the trial, one of the defendants goes into bankruptcy, placing the claim of the plaintiff on his schedule (though denying its validity), and is discharged, and judgment is thereafter rendered against the other defendant for the whole amount claimed, and such other defendant makes no complaint in the district court, and shows no injury, the judgment so rendered will not be disturbed, on the appeal, upon the suggestion that the agreement contemplated that both defendants should be condemned, and that

plaintiff should have made the bankrupt's trustee a party defendant.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1079–1120; Dec. Dig. § 173.*]

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

Action by Frank E. Camp against the Baldwin-Melville Company and Henry Greenwall. Judgment for plaintiff, and defendant Greenwall appeals. Affirmed.

Henry Denis and Clegg, Quintero & Gidiere, for appellant. Lazarus, Michel & Lazarus and David Sessler, for appellee.

## Statement of the Case.

MONROE, J. Plaintiff alleges that he was employed by defendants, as a dramatic artist, for the theatrical season of 1904–05, at a salary of $125 a week, and was discharged, without cause, before the expiration of the term for which he was employed, and he prays judgment for $3,625 as the balance due for the unexpired time. The Baldwin-Melville Company admits that plaintiff accepted an offer of employment, made by it, at a salary of $125 per week, payable weekly, and alleges that he entered upon his employment upon the terms and conditions, and with the understanding, usual in such cases, that the engagement might be terminated, by either party, upon the giving of two weeks' notice to the other; that he was given two weeks' notice "for the break in, or termination of," his engagement, and was laid off for four days, and that he acquiesced therein, and subsequently asked to be, and was, re-employed on the same terms; that, on receiving the notice of discharge of which he now complains, he obtained employment elsewhere, and has, since then, been earning a large salary in such other employment. Henry Greenwall denies that he had any contract with plaintiff; but there is an agreement in the record to the effect that any judgment that plaintiff may obtain shall be rendered against him and his codefendant in solido, without prejudice, however, to their rights inter sese.

The facts of the case appear to be as follows: Plaintiff, on June 27, 1904, at Columbus, Ohio, received from Walter S. Baldwin, then in New York, representing one or both of the defendants, a telegram reading:

"Telegraph, here, lowest salary for next season, opening about September first, possible."

To which he replied:

"One hundred and thirty-five, New Orleans."

On the next day Baldwin again telegraphed:

"One hundred and twenty-five best possible. If accepted, consider yourself engaged. Answer, here, without fail, to-night."

Plaintiff replied:

"We won't argue. Will accept, and consider myself engaged at one hundred and twenty-five. Shake."

Under the agreement thus entered into, plaintiff came to New Orleans, about September 1st, and acted with the Baldwin-Melville Company at the French Opera House (which the company was using, pending the completion of the Greenwall Theater) until October 15th—say six weeks. About October 1st, however, notice was posted on the board in the greenroom "that the season at the French Opera House of the Baldwin-Melville Company would terminate Saturday night, October 13th [15th], and the season at the Greenwall Theater would open Thursday, October 20th"—the object being to let the members of the company know that "for the intervening time, between the closing of the season at the French Opera House and the opening at the Greenwall, there would be no salaries paid." The notice so given was accepted, and the members of the company, including the plaintiff, acquiescing in the with-

holding of their salaries during the interval mentioned, took up their work at the new theater when it opened.

On October 30th plaintiff received from defendant a communication reading:

"Your engagement with the Baldwin-Melville Stock Company will terminate Saturday night, November 12, 1904. You will kindly consider this the customary two weeks' notice, obliging, yours very truly."

And within 48 hours, he took legal advice from the counsel now representing him. Referring to the "season," H. P. Meldon, defendant's stage manager, called as a witness on their behalf, testifies as follows (on cross-examination):

"Q. The season 1904–05 began in September and terminated in May? A. Yes, sir; May 27th, or about that. Q. That was the theatrical season of the Baldwin-Melville Dramatic Company; that is correct, is it not? A. Yes, sir."

On November 7th Baldwin, the manager of the company, being sick in the North, and the witness last quoted finding that he would need plaintiff's services for a while after the date fixed in the notice of October 30th for his discharge, spoke to him on the subject, and thereupon the following correspondence ensued, to wit:

"New Orleans, La., Nov. 7, 1904.
"H. P. Meldon, Esq., Stage Manager. Baldwin-Melville Co. * * * I have carefully considered your verbal request, since my peremptory discharge, without cause, was submitted to me in writing. All communications hereafter between us must be reduced to writing. I will entertain any proposition that you see fit to submit and make my reply promptly.
"Yours very truly,
"[Signed] F. E. Camp."

"New Orleans, La., Nov. 7th.
"Frank E. Camp, Esq.—Dear Sir: Messrs. Baldwin and Greenwall would be glad if you could arrange to remain over for week Nov. 13th–19th, and play the part of Terry Denison in 'Hearts of Oak.' As my first rehearsal of the play will be held to-morrow (Tuesday) morning, may I request an immediate reply, by bearer.
"Sincerely yours,
"[Signed] H. Percy Meldon,
"Stage Director, Baldwin-Melville Stock Co."

On the same day that these letters were written, plaintiff telegraphed to Baldwin (at Buffalo):

"I ask you to reconsider. Give me a chance with better parts, and I'll convince you of my ability. Answer."

He received no answer, and on the following day he replied to the offer, or request, of the stage manager, saying (among other things):

"Considering your request, in the interest of your employers, and without prejudice to my rights, resulting from the breach of contract on the part of the Baldwin-Melville Stock Company, which, I am advised, entitles me to full compensation for the period of my engagement, I will, under the condition stated, take the part, * * * beginning Nov. 13th and closing Nov. 19th, at which date, I desire to advise you, and, through you, your employers, that I shall claim, and insist upon, the payment of my compensation for the full term of my employment, as above set forth."

And, pursuant to the agreement thus made, he remained in defendant's employ until November 19th, and left New Orleans, a day or two after that date, for his home in Ohio. It is conceded that there was no other expressed understanding in the matter of the contract sued on than as contained in the telegraphic correspondence which has been quoted, and defendants, through their counsel, disclaim having discharged plaintiff for cause; their position in the matter being that there is to be read into the contract, as evidenced by the telegrams, a custom or usage, known to theatrical managers and actors, agreeably to which either of the parties to said contract had the right to terminate the relations resulting therefrom by giving two weeks' notice to the other. Plaintiff's counsel objected to the introduction of evidence to prove the alleged custom; but the objection was overruled, though, in deciding the case, the learned judge a quo reached the conclusion that it should have been excluded. The testimony adduced upon that subject was, in substance, as follows:

Plaintiff testified that, in written contracts, where the right to terminate the relations between the parties, by giving two weeks' notice, is intended to be reserved, it is so expressed, and that, whether the contract be written or verbal, where the employment is for a definite term, the right does not exist unless expressed.

Being asked:

"Did you have any understanding, or did you understand, when you were employed, under the telegrams that passed between Mr. Baldwin and yourself, that you could be discharged on two weeks' notice, or that you could leave on two weeks' notice?"

—he replied:

"I never thought of such a thing. It never occurred to me."

Lester Lonergan, an actor of 13 years' experience, testified that, if he were employed "for the season," he would consider himself employed for the entire theatrical season, and that the season of the Baldwin-Melville Company, of 1904–05, began in September and ended in May. Being asked:

"In the absence of any express stipulation that the contract relation may be terminated between the management of the theater and the actor, is there any implied understanding, in verbal agreements, authorizing the termination of those relations, when the employment is 'for the season'?"

—he answered:

"No."

Being asked, on cross-examination:

"Now, Mr. Lonergan, is it not a custom of the profession for actors to sever their connections with companies, or for managers to sever their connections with employés, actors, by giving two weeks' notice?"

—he answered:

"It is loosely called a custom."

He further said that he was a member of the Baldwin-Melville Company during the season 1905–06, and severed his connection with it for cause (as he considered); that as a matter of fact he did not leave the company until the expiration of some two weeks after he had informed the manager of his intention, having told him that he would remain until a substitute would be found. He also said that, if the manager had given him two weeks' notice, he would have accepted it.

The testimony of the defendant Baldwin is in part as follows:

"Q. Now, Mr. Baldwin, state what you understood by this telegram: 'One hundred and twenty-five, postively best; if accepted, consider yourself engaged. Answer, here, to-night.' What contract were you tendering him then? A. I was tendering him the contract as leading man of the Baldwin-Melville Stock Company, at New Orleans, at a salary of $125 a week, provided that he fill the bill or would be satisfactory; or he must be subject— Do you want to know how I understood it? Q. Yes. A. He was to be subject to the rules and regulations governing my company, the same as the other people, and the rules and regulations of theatrical contracts. * * * Q. What is the custom in theatrical engagements, and what is the implied and understood condition in all theatrical contracts, that are not in writing, respecting the term of employment, or the right of discharge, or to leave? * * * A. The custom and rule is two weeks' notice on either side, providing said contract is not made in writing with the two weeks clause eliminated. Q. I don't quite understand. If a contract is printed or written, and the two weeks clause is struck out, then it does not govern? A. Possibly, if I tell you in my own way, the court may understand it. If I would engage you, Judge Clegg, engage your services for a number of weeks or years, I should stipulate the number of weeks or years, thus eliminating all rules or custom, and stating no rules would apply on either side, and both parties would be held responsible to the contract until the expiration of the same. Otherwise, the two weeks clause is inserted in the contract on both sides, and unless it is stipulated no two weeks' notice will be accepted on either side, then either party would be bound by the two weeks' notice. All contracts, in theatrical parlance, carry two weeks' notice, on either side, unless the contract states it is eliminated."

Greenwall, the other defendant, testifies that he has been a theatrical manager for many years and is thoroughly familiar with the "understandings and conditions and terms of contracts that are usual and customary among players and theatrical managers"; and his examination proceeds:

"Q. What is the usual and customary understanding between players and the manager or employer with respect to the termination of contracts? (Objection.) A. Two weeks on either side. 'Q. What do you mean by that? A. That I would give a man or woman notice, and they can give me notice. Q. When there is no stipulation in a written contract respecting the two weeks' notice, what is always the rule or understanding, verbally? (Objection.) A. It applies to the same thing. It has been decided here a few weeks ago. * * * Q. Suppose a telegram invites or contracts an engagement of a player at a salary per week—at a named salary per week—and the offer of employment is accepted and is undertaken, and the actor enters into the services of the employer, is it understood that this agreement, respecting the reciprocal rights to determine that the engagement shall be terminated on notice from either side, obtains? A. Provided it is not otherwise mentioned. If the contract reads 'for the season,' you are bound for the season. If it does not say anything, you are bound for the usual contract in theatrical companies. Q. Suppose the contract reads 'for the season,' what is the theatrical season in New Orleans? A. According to business; I can close in two weeks if I want to, if the business does not justify me in keeping open."

Meldon, defendant's stage manager, testifying on their behalf, says:

"In every printed contract, where a contract exists, the clause is printed: 'Two weeks' notice on either side, in writing, will terminate this engagement.' A man signing a contract 'for a season' simply signs a contract for two weeks. I have not signed a contract myself for 20 years, because I have not asked for one. I did not want it. Q. Suppose the contract is simply a verbal contract or agreement? A. According to the rules governing all contracts, the same thing applies. * * * My engagement was with Mr. Baldwin, * * * with the usual rules to govern. That wasn't even mentioned. It's not necessary to mention it, between manager and actors, unless there is a contract with the two weeks clause cut out. Then it is the number of weeks, and you can claim that number of weeks, or the manager can call on you to play that number of weeks."

It was admitted, in the course of the trial, that the defendant Baldwin had gone into bankruptcy, that he had put plaintiff's claim on his schedule (without admitting its justness), and that he had been discharged, and there was judgment for plaintiff, against the defendant Greenwall, for $3,375, with interest, and ordering the case to be reinstated as to Baldwin, with reservation of plaintiff's

right to make the trustee in bankruptcy a party defendant. Greenwall has appealed.

### Opinion.

Defendants' counsel have filed a supplemental brief in which they frankly say:

"We recognize that it would be sheer nonsense to attempt to vary, by custom, the certain and definite terms of a contract, and we admit that, in a case where an actor has been employed under a contract which fixes, with certainty and definiteness, the terms of his employment, he cannot be discharged before the expiration of that term, upon the customary two weeks' notice, no matter how well established that custom is."

They then proceed to argue that the contract sued on, as expressed in the telegrams through which it was made, does not fix the term of plaintiff's employment, and hence that evidence as to custom was admissible, and, being admitted, establishes defendants' right to terminate the relations resulting from the contract by giving plaintiff two weeks' notice. We have given this argument serious attention, but we find the impression that Baldwin intended to engage plaintiff for the season, produced by his first telegram, reading, "Telegraph, here, lowest salary for next season, opening about September first, possible," confirmed by the fact that no such view as that now propounded is suggested in the answer, and no such defense was relied on in the district court, and by the testimony of Baldwin himself, in which he rests his defense, as we understand him, not upon the fact that plaintiff was not engaged for the season, but upon the proposition that, having been engaged for the season, he was so engaged subject to a custom which authorized his discharge on two weeks' notice. Thus, having been called as a witness for plaintiff, his examination in chief reads in part as follows:

"Q. And he was employed for the season as leading man, was he not? A. He was employed the same as every other man of the company. Q. There was no other agreement between you, except that embodied in the telegram which I

have read? A. No other agreement [than] that the telegram called for the agreement subject to the rules and regulations of the company and theatrical contracts generally. Q. Whatever the agreement was between Mr. Camp and yourself is embodied in these telegrams? A. No, sir; it is not. Q. But the telegrams were sent? A. The telegram simply shows the amount of salary he was to receive for the engagement there for the season, subject to the mutual—you understand—to the mutual satisfaction of both parties. Q. That is the inference you now draw? A. That is the rule, and the one under which I have conducted business for 24 years. * * *."

Cross-examined by his own counsel:

"Q. Now, state to the court exactly what was the agreement between you and Mr. Camp respecting his employment? A. The agreement between Mr. Camp and myself was: He was engaged for the season, at New Orleans, at a salary of $125 per week, subject to all rules and regulations governing my company and regulating theatrical contracts generally."

We conclude, therefore, that plaintiff was employed, and understood that he was employed, for the season; and, whilst it may be that the manager of a theater may bring a season to a close when, acting in good faith, he finds that the necessities of the situation demand it, the fact remains that, whether the season be long or short, those who are employed for that term are entitled to be paid according to their contracts, unless they are discharged for cause. In view of the conclusion so reached, we are of opinion that the judge a quo was right in holding (in deciding the case) that the testimony offered to prove usage, as affecting the terms of the contract sued on, was inadmissible. But, even if it were otherwise, the proof so offered fails of its purpose. Plaintiff testified that he knew of no such usage (as applicable to the instant case) and Lonergan said, in substance, that there is none. To the question:

"Is it not a custom of the profession for actors to sever their connections with companies, or for managers to sever their connections with employés, actors, by giving two weeks' notice?"

—he answered:

"It is loosely called a custom."

But it does not appear that either the question or the answer relates to the case of an actor who is employed for a definite time. Baldwin, as we have seen, says that, though the employment of an actor may be for a definite term, the manager may discharge him, according to the usage which is read into the contract, on giving two weeks' notice, unless there is an express stipulation in such contract "stating no rules would apply on either side." "All contracts," he says, "in theatrical parlance, carry two weeks' notice on either side, unless the contract states it is eliminated." But Greenwall, who has been in the theatrical business nearly twice as long as Baldwin, says:

"If the contract reads 'for the season,' you are bound for the season. If it does not say anything, you are bound for the usual contract in theatrical companies."

And Meldon tells us that all "printed" contracts contain the stipulation, "Two weeks' notice, on either side, in writing, will terminate this engagement;" that "a man signing [such] a contract simply signs for two weeks" (meaning, as we understand him, that the stipulation quoted controls any stipulation by which the term may be fixed); and that the same rule applies to verbal contracts. From all of which it will be seen that there are two witnesses who testify, in effect, that they know of no such usage, applicable to this case, as that relied on; that, of the other three witnesses, one (Baldwin) goes beyond the position assumed by his counsel, another (Greenwall) says that. "if the contract reads 'for the season,' you are bound for the season" (and that is the way Baldwin's proposition, accepted by plaintiff, reads), and the third (Meldon) testifies as to the usage in regard to contracts containing stipulations that they may be terminated by notice (which is not the case with the contract sued on).

The other defenses set up in the answer are not urged in this court and are without

merit. Nothing in the evidence justifies the belief that the plaintiff intended to acquiesce in his discharge. The fact that he earned, or may have earned, money elsewhere during the unexpired term of his contract with defendant, has no bearing, under the textual provisions of our law and the jurisprudence predicated thereon, upon his right of recovery in this case. Civ. Code, art. 2749; Shea v. Schlatre, 1 Rob. 319; Woods v. M. A. Shumard & Co., 114 La. 451, 38 South. 416; Curtis v. A. Lehman & Co., 115 La. 40, 38 South. 887; Daspit v. Holmes, 120 La. 86, 44 South. 993.

It is suggested, in the brief of defendants' counsel, that the judgment appealed from (against Greenwall) being based upon a stipulation to the effect that any judgment that might be rendered in favor of plaintiff should be rendered against the defendants in solido, and no judgment having been rendered against Baldwin, the judgment against Greenwall should be reduced by one-half—which seems to us to involve a non sequitur, since, upon the theory propounded, plaintiff would no more be entitled to judgment against Greenwall for one-half the amount claimed than for the whole of it. The facts, in that connection, however, are as follows: Plaintiff sued the Baldwin-Melville Company and Henry Greenwall, and prayed for judgment against them in solido, and the defendants appeared and answered as hereinbefore stated. When the case was taken up for trial, and before any testimony had been taken, the following agreement was taken down by the stenographer, to wit:

"It is agreed that the plaintiff shall be dispensed from making proof of the existence of the partnership between Walter S. Baldwin, representing the Baldwin-Melville Company, and Henry Greenwall, both of whom are made defendants in this cause, and for the purposes of the trial of this case, and the decision therein, it is expressly stipulated and agreed that whatever judgment, if any, shall go against the defendant in the above-entitled cause, shall be a judgment in solido against Walter S. Baldwin and Henry Greenwall; and this agreement and understanding is made without prejudice to the rights of these defendants inter sese, or to the effect upon any evidence introduced in the cause respecting any partnership agreement."

There was no evidence introduced in regard to any partnership, or in regard to the relation which may exist between Baldwin and Greenwall, or between either of them and the Baldwin-Melville Company; and, after the testimony had been taken, the fact that Baldwin had been adjudicated a bankrupt and had been discharged (after placing plaintiff's claim on his schedule) was made to appear by the following admission, to wit:

"It is further admitted that, since the institution of this suit, and subsequent to the administration of the evidence, * * * Walter S. Baldwin, one of the defendants, has applied for, upon his voluntary petition, the benefit of the bankrupt act of the United States, and that, on his schedule, he has placed Frank E. Camp as a creditor for the amount claimed, if there exists any liability therefor, which is by said Baldwin denied, and that said Baldwin has been granted a discharge by judgment of the bankruptcy court."

Thereafter the case was argued and submitted, and some six weeks later judgment was rendered, as has been stated, and defendant Greenwall thereupon filed a motion for new trial, setting up six alleged errors in the judgment as rendered, but making no complaint on the ground that Baldwin or his trustee had not been condemned. Beyond that, it is not now suggested that the defendant before the court has been prejudiced by that circumstance, and it may be, for aught we know, that Baldwin surrendered no assets, or that the assets surrendered have been consumed in costs, or that, as between Baldwin and Greenwall, the latter had no recourse against the former. But if these hypotheses be unfounded, and there is anything to be gained by it, the defendant Greenwall may seek his recourse in the bankruptcy court. We do not find that plaintiff undertook to follow Baldwin into that tribunal, or that, upon a fair construction of the stipulation agreeably to which the case was tried, the defendant

now before the court is to escape liability because his codebtor in solido applied for and obtained the benefit of the bankrupt law. We construe the stipulation as in effect an admission that, quoad the plaintiff, the two defendants, if liable at all, were liable in solido; and we think, moreover, that if the defendant, in court, considered the ground of complaint now suggested well founded, he should have urged it in the district court, before and after judgment, as he had ample opportunity to do.

There being no error in the judgment appealed from, it is affirmed, at the cost of the appellant.