**54 So.2d 414**

**CARLSON v. EWING.**
**No. 39925.**

June 29, 1951.

Rehearing Denied Oct. 2, 1951.

Sidney G. Roos and Gatlin & Hill, all of New Orleans, for plaintiff-appellant.

James G. Schillin and Fishman, Reuter, Rosenson & D'Aquin, all of New Orleans, for appellee.

MOISE, Justice.

This is an appeal from a judgment involving a suit for breach of an employment contract, rendered in favor of Presley K. Ewing, defendant (plaintiff in reconvention), against Charles C. Carlson, in the sum of $23,079.68, with interest and costs. Carlson, plaintiff (defendant in reconvention) has appealed devolutively; and Ewing has answered the appeal, asking that the judgment be increased to $53,666.62 (however, defendant has admitted in brief that the maximum amount due him is the sum of $46,759.68.)

Under date of December 15, 1943, plaintiff and defendant entered into a contract by the terms of which Carlson, the owner of Radio Station WJBW in the City of New Orleans, engaged Ewing as its general manager for a period of five years, with monthly compensation at the rate of one-third of the net receipts of the station, i. e., the " * * * amount of money received by station WJBW from all sources after deducting the regular expenses of operating the station, including repairs, and maintenance, salaries to employees, etc." This contract, entitled "Managerial Agreement", gave Ewing plenary powers of authority in connection with the operation of the station, with the exceptions (1) that

Carlson retained control of the finances, including the signing of checks (although Ewing had purchasing power and full power to commit the station financially); and (2) that, as licensee of the Federal Communications Commission, Carlson of necessity had to retain supervision and control of programs and of technical operations, in order to insure compliance with all of the Commission's rules, regulations and standards (the retention of such control, though in fact nominal, was in conformity with the provisions of the Federal Communications Act of 1934, Title 47 U.S.C.A. § 309(b) (2) and § 310(b), and the policies of said Commission, adopted pursuant thereto.) The contract contained the further provision: " * * * provided, however, that Carlson reserves the right to cancel this contract by giving to Ewing ninety days notice in writing, by registered mail, addressed to the office of station WJBW, within the first 15 days of any calendar year, if the gross receipts from the operation of said radio station WJBW shall be less than Twenty-five Thousand ($25,000.00) Dollars for the preceding calendar year." Such a contingency was the only basis for possible cancellation of the contract, contemplated at its inception by the contractants; otherwise, the term was unequivocally for a period of five years from its date.

For a brief time the managerial agreement operated smoothly; and, notwithstanding the disputes which soon thereafter

arose between Ewing and Carlson over various questions of management, during the tenure of Ewing's employment the gross receipts of the station quadrupled from their 1943 figure. However, after repeated conflicts and continuing friction, including the successful prosecution of a suit by Ewing against Carlson to recover $2,049.37 in commissions (said suit being entirely unconnected with the instant litigation, except as an additional *casus belli*), the relationship between Ewing and Carlson degenerated to the breaking point and Ewing notified Carlson that he would be compelled to leave the station unless the latter's interferences in Ewing's managerial activities ceased. The record discloses that there was a series of correspondence, meetings and conferences between him and Carlson, either direct or through their respective counsel, seeking to iron out the difficulties which were continually arising, all to no lasting avail.

Failing to receive a satisfactory reply to his final written demand for cooperation, Ewing left the station. On the day following Carlson instituted these proceedings to have the contract of December 15, 1943 annulled and rescinded for Ewing's refusal to continue to perform, and to be relieved of all obligations thereunder. Ewing's defense is that Carlson's acts of interference, enumerated infra, constituted a violation of the contract which made further performance by him impossible, and that they had for their sole purpose the forcing of Ewing to quit and the consequent saving to Carlson of Ewing's one-third share of the profits, said share having reached approximately $20,000 annually (Ewing testified that for the year 1945 he had received "actually 19700 some odd dollars", TR. 90). Ewing has further pleaded, in reconvention, that had be been permitted to perform for the remaining two years and seven months of the contract, his compensation on the basis of $20,000 per annum would have equalled $51,666.62, for which amount, plus $2000.00 approximated earnings for the month of May, 1946, he prayed judgment.

Carlson failed to appear at the trial of this case in the district court. He also failed to produce, either in person or through his counsel, on writ of subpoena duces tecum, the books and records which would have shown with exactness the net profits, and therefore, the net one-third share of Ewing therein, for the remaining two years and seven months of the contract, namely: (1) Federal Income Tax and State Income Tax Returns of Carlson for 1943–1948; (2) Annual Reports of Financial condition of WJBW filed with the Federal Communications Commission for 1943–1948; (3) Annual Audit Reports including Profit & Loss Statement and Balance Sheets of WJBW for 1943–1948; and (4) Monthly Auditor's Reports for 1943–1948. The trial court ruled that the token return as made was not a proper return (Tr. 183), and after tabulating the list of documents produced, we are of the same opinion. Counsel for Ewing moved the

amount prayed for be taken as proven pro confesso, under Article 140 of the Code of Practice, which provides: "* * * the facts stated and sworn to shall be considered as having been confessed, unless satisfactory evidence be shown of the impossibility of producing such documents." However, in rendering judgment accordingly, the learned district judge allowed by way of deductions amounts earned by Ewing elsewhere during the remaining 2 years and 7 months of the contract plus the amount of $1,180.11, being his compensation through May 27, 1946, tendered by Carlson during the trial of the matter, and rendered judgment in reconvention for $23,079.68.

The sole question initially submitted by appellant for our consideration is "whether or not Ewing quit his position of his own accord", or in other words, did Ewing's severance of relations constitute a breach of the contract so as to preclude recovery of any remuneration for the remainder of the employment term. Subsequently, in supplemental brief and oral argument he has urged (in direct contradiction to the hypothesis for the foregoing question, i.e., that the contract was *one of employment*) that the agreement on its face embodied a partnership relation, that Mrs. Louise C. Carlson was a party to the partnership and a necessary party to the litigation, and that the plea in reconvention "showed no right of action because the sole right of action in such case should have been against, first, the partnership, and the partners, second,

for a dissolution of the partnership, and third, for an accounting of the profits." We shall dispose of these contentions in inverse order.

In the first place, the "Managerial Agreement" itself, by its express terms, provided that it was *not* to be construed as a partnership:—"5. It is distinctly understood between Carlson and Ewing that this is a contract of employment and *not a contract of partnership.*" (Italics mine.) Article 2805 of the Revised Civil Code is explicit as to the necessity of the consensual element in the creation of a partnership. The jurisprudence under that Article has been admirably summarized in the recent case of Glover v. Mayer, 209 La. 599, 25 So.2d 242, quoting the earlier decisions of Chaffraix & Agar v. Lafitte & Co., 30 La. Ann. 631; Collom v. Bruning, 49 La.Ann. 1257, 22 So. 744; Shushan Bros. & Co. v. Drennan & Hillcoat, 158 La. 480, 104 So. 214; Reel v. Brewer, La.App., 6 So.2d 99. We reiterate our holding in the Glover case that "for persons to be considered as partners inter sese there must exist an intention to establish that relationship." [209 La. 599, 25, So.2d 244.] In the instant case, the very terms of the contract negative the existence of such intention.

Appellant urges that the agreement for such a large share of the profits to be paid to Ewing is prima facie evidence of a partnership. As a matter of Louisiana law, such an agreement for compensation in the form of a percentage of profits is *not* con-

clusive evidence of a partnership, Chaffraix & Agar v. Lafitte & Co., supra; Collom v. Bruning, supra (where plaintiff's suit fell for lack of proof). Furthermore, the testimony of Ewing (unrefuted by Carlson) concerning the purpose of this profit-sharing arrangement was as follows:—" * * * we finally threshed it all out to where I was to have all this authority that would permit me, I believed at the time, for five years for me to make at least a minimum of $100,000 for myself, an average of $20,000 a year, and a similar amount for him, because I refused absolutely to consider working on a salary of any kind, because I felt *if I named the salary I could make the whole deal blow up*; and I would be willing to gamble upon what I could make (TR. 78) * * * we negotiated in 1943, he had just finished taking in $25,000 gross that year, 1943, and it was for fear—the one cancelling clause we agreed to put in the contract was the fear on his part I might drop the business below that level, and therefore if it ever dropped below $25,-000 he could cancel the contract on reasonable notice. That was one of the reasons I wanted to go there, because of the small volume it was doing (TR. 126) * * * I never worked on a salary since the first year in my business career, always been a percentage (TR. 162.)"

Furthermore, at the time the "Managerial Agreement" was entered into, Carlson was, and indeed had been for many years, the owner and licensee of Radio Station WJBW under the Federal Com-munications Commission and its predecessor, the Federal Radio Commission. The Radio Act of June 19, 1934, 48 U.S. Statutes, Part I, Ch. 652, p. 1064 et seq., 47 U. S.C.A. § 151 et seq., provides with respect to issuance, renewal or modification of licenses, that;

"Neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of this chapter." U.S.C.A., Tit. 47, § 309(b) (2).

"The station license required hereby, the frequencies authorized to be used by the licensee, and the rights therein granted shall not be transferred, assigned, or in any manner either voluntarily or involuntarily disposed of, or indirectly by transfer of control of any corporation holding such license, to any person, unless the Commission shall, after securing full information, decide that said transfer is in the public interest, and shall give its consent in writing." U.S.C.A., Tit. 47, § 310(b).

As a matter of evidence, Ewing reiterated on the witness stand that he had been most careful in working out the terms of the Managerial Agreement not to violate or infringe upon Section 310(b) supra (TR. 77, 104); he further testified that he knew that they (he and Carlson) could not make any contract "that would be violative of the radio act" (TR. 78), that he had submitted it to the Federal Communications Commission, and "the commission's legal staff, including the assistant general counsel of the commission, found this contract

▆▆▆▆▆▆▆

to be O. K." (TR. 79) Even were we to presume that Carlson and Ewing had entered into an agreement which had for its foundation a contemplated de facto infraction of a Federal statute, this Court would leave the parties where it found them, and refuse to give effect to the contract or any fruits thereof.

Art. 1892, R.C.C. "That is considered as morally impossible, which is forbidden by law, or contrary to morals. All contracts having such an object are void."

Art. 2804, R.C.C. "All partnerships are null and void which are formed for any purpose forbidden by law or good morals. * * *"

It is therefore, our opinion that appellant's contention that the Agreement established a partnership is unsupported factually and legally untenable.

▆ In arriving at this conclusion, we have not failed to consider the intervention by Mrs. Louise C. Carlson in the "Managerial Agreement", as follows: "And now comes and intervenes Mrs. Louise Calamari Carlson, divorced wife of Charles C. Carlson, who takes full cognizance of all of the terms and conditions of the within contract, and agrees and binds herself thereto insofar as she may be interested in said radio station WJBW as a result of the judgment of divorce between her and said Carlson, by reason of the operation of the community property laws of the State of Louisiana." We take it as additional proof of the true intent of the parties to said "Managerial Agreement" that in instituting these proceedings, Carlson did not join Mrs. Louise C. Carlson as a party thereto; and it was only *after* the learned trial judge, following the objection to the reconventional demand made by plaintiff's counsel on the first day of the trial—that same disclosed a nonjoinder of necessary parties and that Mrs. Louise C. Carlson had an interest in the outcome of this litigation, did then and there ex proprio motu order that she be made a party to the suit, that Mrs. Carlson was impleaded. The judge a quo based his conclusion on the language of intervention above quoted; however, Mrs. Carlson filed exceptions of no right or cause of action to Carlson's supplemental petition, which are tantamount to a disclaimer of interest. She did not appeal the judgment of dismissal as to her, maintaining her exceptions, which was rendered on February 9, 1949, six months before rendition of the final judgment against Carlson. The record fails to disclose that Carlson appealed this judgment of dismissal, and therefore Mrs. Carlson is not before this Court. Furthermore, while plaintiff's counsel reserved an exception to the judgment aforesaid maintaining Mrs. Carlson's exceptions, she was never served with the order of appeal or the citation, and so, in any event, we have no jurisdiction of Mrs. Carslon in the instant litigation. White v. Hill, 10 La.App. 146, 122 So. 75; Opelousas Finance Co., Inc. v. Roos, 7 La.App. 425.

▮ However, since counsel for plaintiff has urged in supplemental brief and in oral argument before us that Mrs. Carlson is a necessary party to this litigation, we have reviewed the record as to the merit of this contention. Mrs. Carlson herself testified, on the trial of her exceptions of no cause or right of action, that she had signed this contract by reason of her right to a partition of the erstwhile matrimonial community between Carlson and herself, whereof Radio Station WJBW constituted a part. The true purpose of her intervention is brought out by the following testimony:

"A * * * I had a suit for the partition and Mr. Carlson came to me and said we are having a good manager come with us and will give you one-half of the profit if you don't interfere with the contract.

"Q. As a result of Mr. Ewing's coming with the station, you didn't go on with the partition suit? A. No sir * * * all I wanted was one-half of the dividends. That's what the Courts said I should be getting * * * (TR. 443) * * * I had no authority to do or say anything (TR. 446) * * *."

Ewing's testimony is corroborative:

"We made a few suggestions and drew the contract up, and in Mr. Gatlin's office it was signed by Mr. Carlson and myself and Mrs. Carlson, who never had entered into any negotiations with me whatsoever up to the date of the signing. I had never seen her or talked with her, and I am positive she had not been consulted even on any part of the contract itself which she told me later * * * I want to bring out that Mrs. Carlson at that time was brought in because of some condition of community property law which she and Mr. Carlson had a divorce, and I understood he and she owned half of the equipment jointly or something to that effect. My counsel suggested she be brought in to sign the contract, which she did. I think the clause was added later. At that point she told me she had never heard anything about it * * * (TR. 79–80) * * * I negotiated with Mr. Carlson on the basis I would get one third of the net profits of the station. I knew he had some arrangement with his divorced wife. I think the settlement was she was to get half of the earnings. Therefore if I got a third, he got a third and she got a third. * * *." (TR. 103).

Pretermitting the correctness of the district court's ruling on Mrs. Carlson's exceptions (with which we are, nevertheless, in accord), we are of the opinion that Mrs. Carlson's interest, if any, in the outcome of this litigation is nominal. As such, it is not necessary that she be made a party to this appeal. Gibson v. Selby, 3 La.Ann. 317; Modisette v. Hathaway, 147 La. 1035, 86 So. 485; Ivy v. Lusk, 11 La.Ann. 486.

We now advert to the primary issue —the facts giving rise to the alleged breach of contract.

▮▮ A study of the record leads us to the same conclusion as reached by the

learned judge a quo, namely, that: "Ewing's testimony points to a series of interferences and vexatious conduct on the part of Carlson, which he endeavored to have Carlson cease. The court is of the opinion that Ewing is corroborated by the witnesses called by him, and by the correspondence offered by both parties * * * The details of the misconduct of Carlson appear from the correspondence, and appears to be substantially set forth in Ewing's brief. The lengthy evidence adduced on behalf of Ewing, both oral and written, is not denied by Carlson, who did not himself appear or testify. Carlson's non-attendance at the trial impels the belief and justifies the conclusion that he could not have overcome or disproved what had been affirmatively alleged and reasonably established. His failure to produce evidence without satisfactory explanation justifies the drawing of an inference unfavorable to him. (Authorities quoted) * * *." (TR. 53–54) Specifically, the evidence shows that Carlson criticized, abused and cursed employees under Ewing's supervision, causing many of them to leave, so that there was a constant turnover of personnel at a time when, because of war conditions, it was difficult to obtain trained personnel; that he refused to pay on occasion salaries and commissions of persons employed by Ewing; that Carlson was constantly breaching technical and engineering regulations of the Federal Communications Commission and prevented Ewing's remedying conditions [Carlson's continuous disregard and active violations thereof ultimately led to the revocation of his license by the Commission, following the departure of Ewing]; that Carlson ordered Davidson, a consulting engineer whom Ewing had engaged to make tests and repairs of equipment, off the station transmitter house property with a gun before he had had an opportunity to complete his work; that Carlson personally made changes on the transmitter after the chief engineer hired by Ewing had left it in good operating condition; that Carlson prevented Lewis, a rigger, from repairing warning lights on the antenna tower; that Carlson confected fake invoices for supplies and by thus increasing the operating expense, lessened Ewing's eventual share of the net profits; that Carlson fired employees without cause, and precipitated difficulties with the labor union; and that Carlson in general pursued an obstructionist policy with regard to Ewing. We agree with the trial court that, "the evidence shows that * * * Carlson resorted to various devices to disgust Ewing, to induce him to abandon his service, and to make performance by Ewing impossible; and that the actions of Carlson toward Ewing were tantamount to a discharge." (TR. 54). Therefore, under Article 2040, R.C.C., which reads: "The condition is considered as fulfilled, when the fulfillment of it has been prevented by the party bound to perform it." since Carlson's actions made it impossible for Ewing to continue to perform his obligations, they are considered by law as fulfilled. Lloyd v. Dickson, 116 La.

90, 40 So. 542; Southport Mill v. Friedrichs, 171 La. 786, 132 So. 346.

The question of Ewing's compensation remains for our consideration.

Article 2749 of the Revised Civil Code provides:—"If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive, had the full term of his services arrived." At the time Carlson instituted these proceedings, it was impossible to determine what the net profits of Radio Station WJBW would be for the remainder of the five-year term of Ewing's contract; and in his reconventional demand Ewing used as a basis for formulating his claim the net profits for the last full year preceding, i.e. 1945, approximating $20,000 for his one-third share. By the time the matter finally proceeded to trial, the full five-year term had run, and the production of the records included in the writ subpoena duces tecum, referred to supra, would have proven with certainty the exact amount due, were the reconventional demand upheld. They were not produced, and the district court accepted as confessed the entire amount prayed for, subject, however, to deduction of amounts earned elsewhere, as stated supra. The correctness of allowing this offset must be determined in the light of Article 1934, Section 5, Revised Civil Code, as well as Article 2749, Revised Civil Code, above quoted.

Article 1934 relates to the measurement of damages generally. It provides in part that:

"Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:

\* \* \* \* \* \*

"5. Where the parties, by their contract, have determined the sum that shall be paid as damages for its breach, the creditor must recover that sum, but is not entitled to more. But when the contract is executed in part, the damages agreed on by the parties may be reduced to the loss really suffered, and the gain of which the party has been deprived, unless there has been an express agreement that the sum fixed by the contract shall be paid, even on a partial breach of the agreement."

The "Managerial Agreement" makes no provision for damages of any kind whatsoever; evidently, the contractants did not envisage a breach of their mutual covenants. A study of the Article leads us to the conclusion that while it might be applied as the test of damages in that type of business relationship denominated as a "joint adventure", its purview does not extend to the employer-employee relationship, which is covered by a special law.

Article 2749 specifically provides for such an instance as now confronts us

—the discharge of an employee without cause. We have repeatedly held that the fact that such employee may elsewhere earn money during the unexpired term of the contract has no bearing on his right to recover his salary for the said unexpired term. Hill v. American Cooperative Association, 195 La. 590, 197 So. 241; Camp v. Baldwin-Melville Co., 123 La. 257, 48 So. 927; Shea v. Schlatre, 1 Rob. 319; Woods v. M. A. Shumard & Co., 114 La. 451, 38 So. 416; Curtis v. A. Lehmann & Co., 115 La. 40, 38 So. 887; Daspit v. D. H. Holmes Co., 120 La. 86, 44 So. 993.

The learned district judge applied the rule as stated in Hoey v. New Orleans Great Northern R. Co., 164 La. 112, 113 So. 785, which made such an allowance. An examination of the Hoey case shows that it was in the nature of an ancillary proceeding brought to enforce a ruling of the United States Railroad Labor Board. A reference to our earlier opinion rendered on exceptions, Hoey v. New Orleans Great Northern R. Co., 159 La. 258, 105 So. 310, 47 A.L.R. 832, shows that the ruling of the Labor Board specifically provided that the payment for time lost would be subject to the amount earned in other employment. Since both parties had elected to accept the decision of the Board, Article 2749, R.C.C. was not applied. The Hoey case does not, therefore, conflict with our settled jurisprudence on the subject.

The plaintiff in reconvention had approximated his earnings for the year 1946 at $20,000, and therefore for the remaining

7 months at $11,666.62. It has subsequently been brought out that he actually collected for the year 1946 $13,240.32, made up of $12,060.21 received in 1946, plus $1180.11 tendered by Carlson during the trial as compensation for May, 1946. There is therefore due for the remainder of 1946 compensation amounting to $6,758.68, plus compensation for 1947 and 1948 at the amount confessed, $20,000 per annum, or a total amount due to Ewing for the remainder of his contract term, of $46,759.68.

For the reasons assigned, the judgment of the district court is amended by increasing the amount of the award to Presley K. Ewing to $46,759.68, plus legal interest from date of demand and all costs, and, as thus amended, the judgment is affirmed; appellant to pay all costs of this appeal.