BOUTALL, Judge.
This is a suit for breach of contract by a terminated employee against the employer and the personal guarantors of the employment agreement. From a decision in favor of the employee, one of the guarantors appeals.
All the principals in the suit are involved in the offshore oil and gas marine business. The employment contract was executed on August 5, 1981, when Boson — JMJ Marine Corporation, later renamed Golden Gulf Marine Operators, Inc., hired Richard Deso-nier as its president. The recently formed company was organized to operate vessels which service rigs and other offshore work sites. The boats were owned by several partnerships which the Golden Gulf principals, together with outside investors, had formed for that purpose. Richard Desonier had been employed in the oil industry for more than twenty years and left the position of senior vice-president of .Gulf Fleet Marine, the second largest marine company in the world, to move to Golden Gulf.
The employment contract, negotiated by both parties with legal counsel, was for a term of five years at an annual salary of $100,000, plus an immediate bonus of $45,-000, plus a guaranteed annual bonus of $100,000, disability, life and health insurance, stock options, and certain other benefits. The three owners of Golden Gulf, J. Michael Jones, D.E. Bowman, and H. Cameron Thompson, signed the following personal guarantee:
In order to induce Employee to enter into this Agreement, the undersigned, binding themselves jointly, severally and insólido with the Company and among themselves, hereby unconditionally, irrevocably and absolutely guarantee to Employee prompt and complete payment and performance of all obligations of the Company under this Agreement; provided, however, the guaranty herein granted shall cease and terminate when the Employee has received compensation as provided under Section 5 of this Agreement and disability insurance pursuant to Section 10 of this Agreement in the aggregate amount of $1,000,000.00.
Golden Gulf did not prosper and by the spring of 1982 the marine transportation industry itself was in a severe decline. The company was experiencing cash flow problems and in June and July proposed to Desonier that he take a reduction in pay, which he refused to do. On July 30, 1982, he was terminated.
Desonier filed suit on August 12, 1982, against the company and the guarantors in solido to recover salary, bonuses, insurance coverage, and other benefits due for the balance of the five year term of the contract, a total of $1,030,000.00. Golden Gulf filed for protection under Chapter 11 of the Bankruptcy Code, but the automatic stay was lifted on December 8, 1982, and the plaintiff was authorized to proceed against the company. Before trial, Bowman and Thompson settled for $300,000.00 each, for which Desonier released them from their solidary obligation. The trustee in bankruptcy for Golden Gulf did not defend the suit.
On December 1, 1983, the trial judge rendered judgment in favor of Desonier and against Golden Gulf in the amount of $1,106,066.67 and J. Michael Jones in the amount of $368,651.99 (one-third of the total judgment), plus interest and costs.
The issues before this court are:
1) whether the contract was void because of an error of fact;
*1316 2) whether the defendant assumed the risk of a fortuitous event;
3) whether the company had good cause to discharge Desonier and, if so, whether it waived the right to discharge him by condoning his actions;
4) whether the award should include bonuses and insurance premium payments; and
5) whether the judgment should be reduced by any monies earned or to be earned during the balance of the contract. ERROR
We first address the issue of whether or not the contract was void for lack of consent because of mutual mistake. The facts in this case arose before the repeal of Civil Code Book III, Title IV;[1] consequently all references are to the unrevised articles. The appellant relies upon the error of fact which vitiates consent and is sufficient to invalidate the contract. LSA-C.C. arts. 1819, 1821, and 1823.[2] In this case, the error of fact is the parties’ belief that the demand for vessels would continue, which relates to the principal causes of the contract, i.e., for the company to hire Desonier to find employment for the vessels and for Desonier to receive $1,000,000.00. Neither party had any inkling at the time of the signing of Desonier’s contract and even after he became president that a downturn in the petroleum marine transportation industry would occur within a year.
The appellee correctly points out that for an error of fact to vitiate a contract the error must pertain to a condition existing at the time of confection of the contract. In a recent article, Professor George L. Bilbe relates the common law concept of “mistaken assumption” to the Louisiana Civil Code’s concept of error as to principle cause, and says:
“... Generally, mistaken assumption is used in describing a situation in which contracting parties mutually understand every provision they have made express but one or more are mistaken as to circumstances existing at the time their agreement is made ...”
44 La.L.Rev. 825 (1984), at 825.
Our case deals with erroneous assumptions as to future business conditions. We disagree with the appellant’s reliance upon Walker v. Don Coleman Const. Co. Inc., 338 So.2d 1183 (La.App. 2nd Cir.1976), in which the court allowed rescission of a contract to sell land on the basis of LSA-C.C. art. 1825, error as to motive. Unknown to the parties, governmental approval of the purchaser’s planned use of the property would necessitate a long delay in building a subdivision. Governmental approval was a condition written into the contract and timely performance was held to be a principal cause of the contract. Both causes were frustrated by events over which the parties had no control.
In the case before us there was no contractual agreement to pay Desonier only if business was good. There was no error as to his qualifications or the services he was to perform. His failure to live up to the other parties’ expectations in dealing with a slow market does not constitute error as contemplated by the code.
*1317 FORTUITOUS EVENT
The appellants also view the market collapse as a fortuitous event which will exonerate the debtor from performing a contract under LSA-C.C. art. 1933(2).
A fortuitous event is defined by LSA-C.C. art. 3556(15) as “that which happens by a cause we cannot resist.” Louisiana courts have held that economic declines are events that make performance economically unfeasible but not impossible in the sense intended by art. 1933(2). Marionneaux v. Smith, 163 So. 206 (La.App. 1st Cir.1935). We agree with the trial judge that in any business venture the undertaker assumes the risk that circumstances beyond his control may cause the venture to fail. There is no guarantee to the entrepreneur that the general business climate will continue to exist.
DISCHARGE FOR CAUSE
Under LSA-C.C. art. 2749, an employee who was hired for a certain term and discharged before the end of the time “without any serious ground of complaint” is entitled to “the whole of the salaries which he would have been entitled to receive ...” The letter of termination given to Desonier stated merely that he was discharged for cause.
Whether or not an employee has been fired for cause is a question of fact, which may not be disturbed in the absence of manifest error. Higgins v. Smith Intern. Inc., 716 F.2d 278 (5th Cir.1983); Laneuville v. Majestic Industrial Life Ins. Co., 223 La. 724, 66 So.2d 786 (1953); Morris v. Manufacturers’ Enterprises, Inc., 442 So.2d 582 (La.App. 1st Cir.1983). The case of Lanier v. Alenco, 459 F.2d 689 (5th Cir.1972), cited by the trial court, provides that failure to agree to reduced pay is not good cause for discharge, because under LSA-C.C. art. 1901 a change in the terms of a contract requires bilateral consent.
In his reasons for judgment, the trial judge in the case before us said:
“Plaintiff's testimony at trial indicates that he performed all of his duties outlined in the employment contract as reasonably could be expected of him given the declining market in the marine transportation industry and Golden Gulfs deteriorating financial condition ...”
The section of the employment agreement that sets out Desonier’s duties reads as follows, in pertinent part:
“2. Position and Responsibilities. The Company employs Employee and Employee agrees to serve as President of the Company for the term and on the conditions hereinafter set forth. Employee agrees to perform such services as shall from time to time be assigned to him by the Company’s Board of Directors. Specifically, but not by way of limitation, Employee shall have the responsibility to obtain gainful employment of the vessels operated by the Company at or above competitive charter hire. Employee shall have all power and authority on behalf of the Company to negotiate and execute contracts for charter hire of the vessels operated by the Company. Employee shall also have power and authority to contract for the operation of vessels other than those listed on Exhibit ‘A’ ...”
We must determine whether Desonier managed the company to the best of his ability. He did not guarantee that he would cause the business to perform at a certain level. The contract gave him an incentive to exert his efforts to the utmost by providing, in addition to a guaranteed minimum bonus of 10% of the first $1,000,-000 of gross revenue, an additional “Percentage Bonus” of 5% of the next $3,000,-000 and 3% of gross revenue over $4,000,-000.
The testimony as to Desonier’s performance of his duties and the contract is conflicting. D.E. Bowman was unavailable for trial and his deposition was admitted into evidence. He testified that he felt, after checking the records and invoices of the company sometime in June or July, 1982, that Desonier was a poor manager, had not watched expenses carefully, and was lacking in “cost consciousness.” When asked for specific acts which would justify termination, Mr. Bowman said, “I cannot point out any one instance when Mr. Desonier *1318 did anything in particular that was so onerous to cause his termination.” He added, “It was a sin of omission rather than [c]om-mission.”
At trial J. Michael Jones testified that, because Golden Gulfs income came from a percentage of the rentals of the vessels, Desonier’s primary function was to locate employment for the boats, regardless of market conditions. He complained that the supply boats were not working and the final blow came when they lost the contract for two of the five large boats. Apparently the loss occurred shortly before Desonier’s discharge.
A summary of days worked by the various boats, compiled by the defendant, shows that four of the supply boats were utilized at rates from 82.87% to 100% during the period of January 1 to June 30, 1982. The last supply boat to be delivered came on line as of April 14, 1982, and was utilized only 64.10% for the period but worked continuously from May 12 through June. The six utility boats were greatly under utilized, at rates from 11.60% to 49.17%.
Desonier blamed the lower utilization of the utility boats largely on the decline in the market, pointing out that the summary failed to cover any ,of 1981, when most of the utility boats were operating. Desonier explained that factors other than the economy also account for the difference in demand for the supply boats and utility boats. Being smaller and cheaper to build, utility boats are more plentiful, making the market more competitive. They are used during the working season as maintenance vessels. They rarely can work year round but operate from April or May through October or November, depending on the weather offshore. As the decline in offshore activity deepened, there was little work for the crew boats, which ferry personnel to and from the rigs.
Desonier was aware of an acute cash flow problem in the fall of 1981, necessitating loans from two of the company’s owners. At Bowman’s suggestion, he tried to reduce overhead by moving to Bowman’s building on the West Bank. He also reduced the number of crew members on the vessels, but could not cut back enough to make a real difference.
Whether or not the plaintiff was discharged for cause is a question of fact and a matter of credibility of witnesses. As the record supports the decision of the trial court and we find no manifest error, we adopt his conclusion that Desonier performed adequately under the contract and was discharged without cause. Accordingly, we pretermit consideration of whether Golden Gulf condoned the actions of Deso-nier, thereby waiving its right to fire him for cause.
AWARD
The trial judge set out the elements of damages in his reasons for judgment, as follows:
Salary from August 1, 1982 — December 31,1986: (4 and % years $ $100,000.00 per annum) $441,666.67
Bonus due 1982 — 1986: (5 years at a minimum of $100,000.00 per annum) $600,000.00
Health and Life Insurance from August 1, 1982 — December 31,1986: (4 and ¾2 years at $4,800.00 per month) $254,400.00
TOTAL DAMAGES $1,106,066.67
The appellant argues that, in the event the court finds Desonier’s discharge to have been unjustified, it should follow the holding of Brasher v. Chenille, Inc., 251 So.2d 824 (La.App. 3rd Cir.1971). That court construed “salaries” as including salary plus commissions but not “fringe benefits,” i.e., retirement plan contributions, hospital insurance, travel expense, board and lodging. LSA-C.C. article 2749 is a punitive statute and must be strictly construed. Accordingly, the appellant would restrict the award to salary only and vacate the bonus and health and life insurance awards.
The employment agreement provides De-sonier’s bonus, as follows:
“In addition to the Base Salary provided for in Section 5A, for each of the fiscal years ending December 31, 1982 through *1319 1986 and provided this Agreement has not been terminated prior to such date, Employee shall receive a bonus of 10% of the first $1,000,000 of gross revenue, 5% of the next $3,000,000 of gross revenue, and 3% of gross revenue over $4,000,000 (the ‘Percentage Bonus’) ... Notwithstanding the foregoing, Employee shall receive annually beginning December 31, 1982 a minimum bonus of $100,000 per year (the ‘Minimum Bonus’). The Minimum Bonus shall be paid in the same manner provided for the Percentage Bonus. The Percentage Bonus for each year shall be reduced by (1) the Minimum Bonus for such year and (2) any Excess Minimum Bonus from prior years. For purposes of this Section 5C, ‘Excess Minimum Bonus’ shall mean the excess, if any, of the Minimum Bonus for a particular year over the Percentage Bonus for such year.” [Emphasis supplied.]
By the clear wording of the contract, Desonier was to be given a minimum bonus irrespective of the company’s gross revenue. We construe the minimum bonus to be salary, to which he is entitled under LSA-C.C. art. 2749. Following the ruling of Brasher v. Chenille, Inc., supra, we find that Golden Gulf does not owe Desonier health and life insurance premiums. Accordingly, we amend the judgment against Golden Gulf to restrict the award to salary of $441,666.67 and bonus of $500,000.
The liability of the guarantor differs from that of the company. The promise is to guarantee not only payment but “performance of all obligations of the Company under this Agreement.” The guarantee is to end when Desonier has received salary and/or disability payments amounting to $1,000,000. As Desonier had not yet received a total of one million dollars, the guarantee of “performance of all obligations” remains in effect. Therefore, the judgment against Jones consists of his virile share of salary, bonus, and life and health insurance.
The award of $254,400.00 for insurance was based on Jones’ testimony that the company was paying insurance premiums of $4,800 per month for Desonier. We believe that the total is incorrect, because under the terms of the life insurance section of the contract, Desonier and the company divided the coverage, the employee naming a beneficiary for one portion and the company being the named beneficiary for the other portion. The ratio began at 50/50 and graduated to 90/10 over the five year term of the contract.[3] There are no records from which this court can calculate the amount of the award for insurance. Accordingly, we affirm the judgment against J. Michael Jones but remand the *1320 case to the trial court for correction of the amount of the award.
MITIGATION OF DAMAGES
The appellant urges that any award to the plaintiff should be offset by the compensation he actually has earned or could be expected to earn. We believe this argument has no merit, as the ruling of our Supreme Court in Carlson v. Ewing, 54 So.2d 414 (La.1951) has not been overturned. The court held, at 421:
“... [T]he fact that such employee may elsewhere earn money during the unexpired term of the contract has no bearing on his right to recover his salary for the said unexpired term.” [Citations omitted]
In summary, we amend the judgment in favor of Richard Desonier and against Golden Gulf Marine Operators, Inc., reducing it by the sum of $254,400.00, and, as amended, affirm it. We affirm the judgment in favor of Richard Desonier and against J. Michael Jones except for the award for insurance, and remand for the limited purpose of receiving evidence related to cost of life insurance premiums and correction of the amount of the insurance portion of the award.
AFFIRMED, AMENDED AND REMANDED

. Acts 1984, No. 331, effective January 1, 1985.

. The repealed articles read as follows:
"Art. 1819. Consent; facts vitiating consent. Consent being the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by — error; fraud; violence; threats.”
"Art. 1821. Error of fact. That is called error of fact which proceeds either from ignorance or that which really exists, or from a mistaken belief in the existence of that which has none.”
"Art. 1823. Sufficiency of error to invalidate contract. Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, which was a principal cause for making the contract, and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself.”

. "11. Life Insurance. To the extent Employee is eligible for such coverage and remains insurable, the Company shall provide Employee with term life insurance of his choice in the amount of $1,000,000. The policy chosen by Employee for the First Year of Employment will continue in the second and all subsequent years hereunder. During the First Year of Employment, fifty percent of the premium shall be paid by the Employee and fifty percent shall be paid by the Company. For all subsequent years premium shall be totally paid by the Company. Employee shall designate the beneficiary of the first $100,000 of coverage. During the First Year of Employment hereunder the Company shall be the beneficiary of 50% of such life insurance in excess of $100,000 and Employee may designate the beneficiary of the remaining 50%. During the second year of employment the Company shall be the beneficiary of 40% of such life insurance in excess of $100,000 and Employee may designate the beneficiary of the remaining 60%. During the third year of employment the Company shall be the beneficiary of 30% of such life insurance in excess of $100,000 and Employee may designate the beneficiary of the remaining 70%. During the fourth year of employment the Company shall be the beneficiary of 20% of such life insurance in excess of $100,-000 and Employee may designate the beneficiary of the remaining 80%. During the fifth year of employment, the Company shall be the beneficiary of 10% of such life insurance in excess of $100,000 and Employee may designate the beneficiary of the remaining 90%. After the fifth year of employment, Employee may designate the beneficiary of 100% of the policy. The Company has the right, but not the obligation, to purchase additional life insurance on the life of Employee naming the Company as beneficiary and Employee shall submit to such physical examinations as may be required with respect to the purchase of such insurance."