516 So.2d 157 (1987)
Edwin P. BRANNAN
v.
WYETH LABORATORIES, INC., and American Home Products Corporation.
No. 87-CA-349.
Court of Appeal of Louisiana, Fifth Circuit.
November 9, 1987.
Writ Granted January 29, 1988.
*162 Partee, Waldrip, Mott, Tynan & Evans, Barbara Ryniker Evans, New Orleans, for defendants-appellants.
Post & Reinhardt, William H. Reinhardt, Jr., William M. McGoey, Metairie, for plaintiff-appellee.
Before CHEHARDY, C.J., and BOWES and GOTHARD, JJ.
CHEHARDY, Chief Judge.
This appeal arises from a jury verdict rendered in favor of plaintiff, Edwin P. Brannan, and against defendants, Wyeth Laboratories, Inc. (Wyeth), and American Home Products Corporation (AHPC), in a suit for breach of an employment contract, defamation, wrongful denial of stock option rights and wrongful denial of dental benefits. Damages were awarded to plaintiff in the amounts of $300,000 for breach of the employment contract; $250,000 for defamation; $40,000 for the stock option rights; and $350 for dental benefits.
In 1964 plaintiff interviewed with Wyeth and its parent corporation, AHPC, for a position in pharmaceutical sales. At the time he was employed as a research chemist with Louisiana State University Medical School, a position enjoying the security of civil service. After two interviews, the first with District Manager Frank Messina and the second with Messina and Division Manager Bernard Kaiser, plaintiff was hired. He was sent to Memphis, Tennessee, for training and ultimately received a sales territory in the New Orleans, Louisiana, area. Eighteen years later, in October 1982, plaintiff was terminated for falsifying doctor call reports.
After being fired, plaintiff requested Wyeth to pay certain dental bills incurred on behalf of his children, which the company refused to do. Plaintiff also attempted to exercise a portion of his stock option rights. The stock option plan provided the employee with the right to purchase company stock at a previously fixed amount within 90 days after termination, except in cases of voluntary termination or for termination for gross misconduct. The company refused this request as well.
As a result of his termination and the denial of his benefits, plaintiff filed suit for breach of an oral employment contract in which he alleged he had an oral contract with Wyeth which assured him employment and which provided that he would not be terminated except for just cause. He further alleged that subsequent to his termination certain Wyeth employees informed members of the pharmaceutical industry *163 that he had been fired for not working, for falsifying reports, and for pursuing personal activities on company timeall of which plaintiff denied. Plaintiff also sought damages for the company's refusal to allow him to exercise his stock option rights and for the dental payments they refused to pay.
During the period preceding trial, defendants filed several peremptory exceptions of no cause of action and motions for summary judgment, all of which were denied, as was a writ taken to this court on those issues. (Brannan v. Wyeth Laboratories, Inc., and American Home Products Corporation, No. 86-C-220, April 9, 1986).
The case finally went to trial on November 10, 12 and 13, 1986, before a 12-person jury. Following the trial, the jury returned the above-mentioned verdict. Defendants then filed a motion for judgment notwithstanding the verdict (judgment N.O.V.). After the motion was denied, defendants perfected this appeal and plaintiff cross-appealed.
On appeal defendants assert the trial judge erred in denying their peremptory exception of no cause of action, their motion for summary judgment, their motions for directed verdict and/or for judgment N.O.V. on the contract claim. Defendants also contend that the jury was erroneously instructed; that the trial court erred in refusing to admit evidence at trial of plaintiff's subsequent employment and his termination therefrom; that the trial court erred in refusing to admit evidence of plaintiff's work history with defendant Wyeth; and that the verdict and the award were manifestly erroneous as to the contract claim. Defendants further assert the trial court erroneously denied their exception of no cause of action and their motion for summary judgment on the defamation claim; that the trial judge erred in denying their motions for directed verdict and judgment N.O.V. on the defamation claim, the stock option claim and the dental claim; and that the verdict and award were manifestly erroneous as to all of those demands.
In his cross-appeal, plaintiff asserts the jury erred in its award for the breach of employment contract. In this respect plaintiff contends the jury failed to award plaintiff the full amount due him for the entire term of the contract pursuant to LSA-C.C. art. 2749.
Our initial inquiry in this case is whether defendants' peremptory exception of no cause of action and/or their motion for summary judgment should have been granted by the trial court as to the contract claim.
The peremptory exception of no cause of action is designed to determine the sufficiency in law of the plaintiff's petition. Darville v. Texaco, Inc., 447 So.2d 473 (La.1984). The exception is triable solely on the face of the petition and for the purpose of determining the exception, the well-pleaded facts in the petition must be accepted as true. LSA-C.C.P. art. 927; Darville, id. The exception must be overruled unless the allegations of the petition show plaintiff has no cause of action under any evidence admissible under the pleadings. Darville, id. If the allegations of the petition set forth a cause of action as to any part of the demand, the exception must be overruled. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982); Gulf Oil Corp. v. Marine Concrete Structures, Inc., 464 So.2d 829 (La.App. 5 Cir.1985), writ denied, 468 So.2d 1208 (La.1985).
The petition filed by plaintiff initially asserted that plaintiff had an oral agreement with defendants and that he was terminated arbitrarily, capriciously, unreasonably and without just or lawful cause. The petition was subsequently amended in response to defendants' first exception of no cause of action to state the employment was for a definite term, that is, so long as defendant Wyeth did not have reason or cause to terminate him, the causes being enumerated in the company manual. The petition further added an allegation that plaintiff was entitled to notice and an opportunity to correct any alleged violations prior to termination as provided by the employment *164 manual. Plaintiff alleged he was entitled to such notice and probation whether or not the contract was for a fixed term.
Where an employee is employed for an indefinite term, Louisiana law generally provides the employment relationship is terminable at the will of either party. Pechon v. National Corporation Service, 100 So.2d 213 (La.1958); Williams v. Delta Haven, Inc., 416 So.2d 637 (La.App. 2 Cir. 1982). Absent a specific contract or agreement establishing a definite term of employment, the employer may dismiss the employee for any reason without incurring liability. LSA-C.C. art. 2747; Williams, id.; Gil v. Metal Service Corp., 412 So.2d 706 (La.App. 4 Cir.1982), writ denied, 414 So.2d 379 (La.1982); Jackson v. East Baton Rouge Parish School Bd., 393 So.2d 243 (La.App. 1 Cir.1980).
In a fixed-term contract, the breach of the agreement by the employer entitles the employee to the wages he would have received had he worked for the full term. LSA-C.C. art. 2749. Generally the contract may not extend beyond 10 years. The source of the 10-year rule is found in LSA-C.C. art. 167 and is used in conjunction with LSA-C.C. art. 2746, which states a laborer may only hire his services for a limited time. That time limitation, however, does not apply where there is special consideration. Pitcher v. United Oil and Gas Syndicate, Inc., 139 So. 760 (La.1932); Simmons v. Westinghouse Electric Corporation, 311 So.2d 28 (La.App. 2 Cir.1975).
While the jurisprudence has for the most part rigidly adhered to these rules, the courts have deviated from the strict interpretation of the articles under some circumstances. Recovery is not precluded and the employer may be bound where the employer has made promises to the employee related to a job disability. Aguillard v. Lake Charles Stevedores, Inc., 284 So.2d 124 (La.App. 3 Cir.1973), writ denied, 286 So.2d 663 (La.1973); see also, Freeman v. Elbilco, 338 So.2d 967 (La.App. 4 Cir.1976). Likewise, the employer may be liable in damages where the firing is deemed to be outrageous conduct. Maggio v. St. Francis Medical Center, Inc., 391 So.2d 948 (La.App. 2 Cir.1980), writ denied, 396 So.2d 1351 (La.1981).
The law on employment contracts favors the termination-at-will concept for employment without a fixed term. However, as seen by the above cases, it does not totally prohibit an employer from modifying or altering its right to terminate at will employees hired for an indefinite term. In Williams, supra, and Morgan v. Avondale Shipyards, 376 So.2d 516 (La. App. 4 Cir.1979), the courts noted if the employer wishes to contract that the terminable-at-will employee will not be terminated except for just cause, there is no reason the courts will not enforce such an agreement. Modification of this right to fire at will, however, must be shown by a specific contract or agreement. Williams, supra. (But see Westinghouse, supra, stating the agreement must be supported by extra consideration.)
In determining whether an employment agreement exists, the personnel manuals and related documents do not per se constitute the contract. Williams, supra; Terrebonne v. La. Ass'n of Educators, 444 So.2d 206 (La.App. 1 Cir.1983). Those documents, however, may be used as supporting evidence of an oral agreement.
In this case plaintiff's petition asserts he and Wyeth entered into an oral contract and the agreement and its terms are supported by the personnel manual. The petition further contends the contract was to remain in effect unless the employer found just cause to terminate his employment. The petition states a cause of action for breach of an employment contract. Consequently, the trial court properly denied defendants' peremptory exception as to the contract claim.
Defendants next argue their motion for summary judgment was improperly denied as to the employment contract claim. This issue is moot since the case has already been tried and a verdict rendered. Furthermore, we previously held in a writ to this court that there existed disputed *165 issues of material fact. Brennan, supra.
In defendants' third issue it is contended the trial court erred in failing to grant defendants' motions for directed verdict and judgment N.O.V. on the employment agreement claim. Defendants further contend the jury verdict was manifestly erroneous on that claim. Alternatively, defendants allege the jury was erroneously instructed and thus the manifest error rule does not apply to our review of the jury's determination of liability.
The standard to be applied in ruling on a motion for judgment notwithstanding the verdict is the same as that used on a motion for directed verdict. Campbell v. Mouton, 373 So.2d 237 (La. App. 3 Cir.1979). Either of those motions is properly granted where the facts and reasonable inferences point so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504 (La.App. 5 Cir.1984), writ denied, 449 So.2d 1359 (La. 1984). All of the evidence should be considered in the ruling on the motions, not just the evidence supporting the non-mover's case, and it should be considered in the light most favorable to the opposing party. Courtney, supra; Oppenheim v. Murray Henderson Undertaking, 414 So.2d 868 (La.App. 4 Cir.1982). Furthermore, factual findings of the trial court cannot be overturned by the appellate court unless it is determined the factual findings were manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Plaintiff herein testified he was interviewed for the position of sales representative while still employed at LSU Medical School. He asserted that throughout his two employment interviews he was concerned with job security since his position at LSU was civil service and he would be giving up that security if he terminated his employment with LSU. Plaintiff asserted it was made clear to him by both Messina and Kaiser in both interviews that he was being interviewed for a permanent position and that he would not be fired as long as he performed his job. He stated he again raised the subject during his training program and was again assured by Kaiser that he would not be fired arbitrarily. During the two interviews he also stated the pension plan was discussed and that he was told the normal retirement was at age 65 years. He stated it was his understanding he was hired for as long as he performed properly and that he could not be dismissed without reasonable cause for dismissal. Further, he testified he was told he would be given a probationary period to correct any deficiencies the company might feel existed.
In support of his assertions, plaintiff produced various company documents. He pointed out an agreement he was required to sign involving the handling of Wyeth's samples which stated the misuse of those samples was just cause for dismissal. He also produced an "employment agreement" wherein he agreed, among other things, to give up his right to any product he discovered or invented while employed with Wyeth and that Wyeth would become sole owner of those products or inventions. Additionally, plaintiff introduced the employment manuals setting forth the general grounds for dismissal and probationary procedures. Plaintiff did not contend the documents constituted the agreement. He stated they were consistent with the understanding he believed existed between himself and defendant Wyeth, and the documents served to reinforce that belief.
Defendants' employees, Messina and Ronald Gross (a sales representative), testified that the company could fire anyone at any time. However, the testimony of both witnesses was contrary to their deposition testimony in which they stated Wyeth could terminate only for just cause. Messina attempted to explain the inconsistency by claiming he was nervous during the deposition and further stated he never told plaintiff he could be fired only for cause.
Bernard Kaiser testified that he did not offer plaintiff an employment contract of any kind either during the plaintiff's interview or at any time. His testimony was contradicted by the "employment agreement" *166 involving patents and inventions heretofore mentioned, which he signed along with plaintiff. However, he stated this document was a routine company document, that he never told plaintiff the job was permanent, did not promise to keep him employed until age 65, did not discuss the pension plan, and did not negotiate an employment contract with plaintiff. He further stated he did not speak to plaintiff about job security.
The division sales manager for Wyeth, James French, also testified. He admitted Wyeth could terminate an employee only for job cutbacks, poor sales performance and some other act constituting serious or just cause. However, he contended Wyeth never had a policy requiring just cause for termination. Likewise, Donald Dowling, a Wyeth senior corporate executive, testified Wyeth never gave any territory sales representatives a guarantee of continued employment. He admitted, however, that at the time plaintiff was hired, Kaiser was plaintiff's boss and he did not know what arrangements Kaiser made with plaintiff, if any.
The record in this case shows that plaintiff was a credible witness and that there were numerous inconsistencies in the testimony of defendants' witnesses. It is the function of the trial court to determine the credibility of witnesses and it is the credibility of those witnesses and the other evidence which satisfies a party's burden of proof, not the sheer number of witnesses. Thus, despite the large number of witnesses testifying on defendants' behalf, the evidence and its reasonable inferences do not point so overwhelmingly in favor of defendants that reasonable minds could not have reached a contrary verdict. Consequently, we find the trial court properly denied defendants' motions for directed verdict and judgment N.O.V. on the contract issue.
Alternatively, defendants argue the jury instructions were erroneous and thus the jury verdict is not entitled to any weight or presumption of regularity. In such cases, defendants assert, the appellate court must review the facts de novo. Defendants assert those facts do not include proof of a contract for a fixed term.
This court must exercise restraint before overruling a jury verdict on the suggestion of erroneous jury instructions. Cuccia v. Cabrejo, 429 So.2d 232 (La.App. 5 Cir.1983), writ denied, 434 So.2d 1097 (La.1983). While defendants are correct that an erroneous jury instruction may require a review of the case by trial de novo in the appellate court, a judge is not required to give the precise instruction submitted by either party. Cuccia, id. The trial judge's duty is to charge the jury as to the law applicable to the case. Cuccia, id. Adequate instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App. 3 Cir.1985), writ denied, 480 So.2d 738 (La.1986).
The jury instructions herein included the text of LSA-C.C. arts. 2747 and 2749. C.C. art. 2747 states:
"A man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for so doing. The servant is also free to depart without assigning any cause."
C.C. art. 2749 provides:
"If, without any serious ground of complaint, a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay * * * the whole of the salaries which he would have been entitled to receive, had the full term * * * arrived."
The court also charged the jury that a contract of unspecified duration may be terminated at the will of either party by giving notice, reasonable in time and form, to the other party. In conjunction with those articles, the trial judge instructed the jury further that plaintiff would prevail by proving a contract of employment existed, that the contract was breached by defendants, and that there was actual damage to plaintiff as a result of the breach.
*167 Defendants contend these instructions were defective because even if a contract existed, a finding of a definite term was also required for plaintiff to prevail. However, in reviewing the record, we find the defendants failed to object to the jury charges on that basis. They did object to the jury interrogatories for failing to include a determination of fixed term, but the interrogatories must be responsive to the charges. Thus, by failing to object to the jury charges, the defendants waived their argument in that respect. Furthermore, as we have discussed previously, the law does not preclude a contract by which defendant binds itself to fire an employee only for just or reasonable cause. We, therefore, find no error in the jury charges and conclude as well that the jury was not clearly wrong in finding a contract existed between the parties.
Defendants next argue that even if a contract existed, the jury erred in its finding of liability because plaintiff was fired for just cause. Defendants assert that plaintiff was fired for falsifying doctor call reports.
Plaintiff's position as territory manager (a sales representative) was unsupervised and thus he was required to file accurate sales call reports to assure Wyeth he was carrying out his responsibilities. Plaintiff and defendants' witnesses all agreed falsification of those reports would constitute just cause for termination. Defendants attempted to prove plaintiff failed to call on certain doctors during the week of September 13, 1982, contrary to his report filed for that week.
The evidence presented by defendants consisted of the testimony of Messina, French, Dowling and several physicians. In order to prove defendants had just cause to fire plaintiff, defendants attempted to show plaintiff had a history of failing to make sufficient calls, and showed at least one time (in 18 years) plaintiff had been placed on probation.
In regard to the events preceding plaintiff's termination, Messina testified he received a telephone call from Dr. Andrew Rinker's office in August 1982, complaining that he had not seen plaintiff recently and was having difficulties getting defendants' product. As a result plaintiff's sales call reports were reviewed. Those indicated plaintiff had left small numbers of samples with some doctors. Because of the review, Dowling was consulted. He stated the decision to fire a sales representative had to be a joint decision between himself, Messina and French. The investigation was necessary because the district manager (Messina) and division manager (French) had to prove a justification. Final approval was made by the vice-president of sales, the field sales manager, Messina, French, Dowling and the company attorneys. When he was notified by Messina and French and the field sales manager that there was a complaint about plaintiff's conduct, Dowling stated he authorized a surveillance of plaintiff and began to examine some of plaintiff's scan sheets and weekly reports. Because of the low number of drugs being detailed and samples left with the physicians, he stated he believed plaintiff was not reporting accurately. After a two-day surveillance which was inconclusive, Messina began interviewing certain doctors.
Messina testified he spoke with several doctors on September 27, 1982, and those doctors told him plaintiff had not made a sales call during the time period involved in Messina's questioning. The testimony then becomes somewhat confusing and inconsistent.
Messina stated he visited Drs. Ronald Martz, Sarah Lain and Sterling Dunn alone on September 27, 1982. Messina asserted he visited the doctors again in 1985 with French in preparation for trial. However, Drs. Dunn, Lain and Dabney Ewin testified that when they talked to Messina in 1982 he was accompanied by another Wyeth representative.
Messina and French both testified plaintiff confessed to falsifying reports during his annual review in October 1982 (shortly after the investigation began). However, the version of each witness of the alleged confession differed. French and Messina stated they decided to fire plaintiff after *168 the interview in October in which he allegedly confessed, yet Dowling indicated the decision to terminate plaintiff was made in September 1982.
Several of the doctors stated they did not see plaintiff on the day or during the period questioned by Messina in his investigatory visit. Yet Dr. Lain and her assistant, who stated "detailmen" or women were seen by appointment only, agreed on cross-examination that Dr. Lain saw salespeople without appointments as well. In fact she had no appointment listed for Messina's alleged visit in September.
Dr. Martz said he did not see plaintiff in September 1982 and that he remembered the period involved because he had not seen plaintiff for "awhile." He, however, maintained no records on sales calls and had no complaints about plaintiff in the years plaintiff had been assigned to call on him. Dr. Dunn's recollection appeared to focus on plaintiff's failure to get in touch with him in the spring of 1982, although he contended it was unlikely plaintiff visited him as frequently as reported between June and August 1982. Dr. Dunn also stated he did not keep records on sales calls and that numerous representatives called on him from various pharmaceutical companies. Dr. Ewin testified he remembered speaking to Messina and another man in 1982 regarding plaintiff's visits, but could not remember the specifics of the dates involved.
Plaintiff unequivocally denied he falsified any reports at any time. He further denied "confessing" to that violation in his interview with French and Messina. He stated no one in the company asked him about Dr. Rinker's complaints and that he was first confronted with the accusation of falsifying reports midway through the four-hour evaluation in October 1982. He explained in detail the inner workings of his job and explained the statistics on the reports. He contends the sale of certain items had been assigned to another representative (birth control pills), but that he still visited some doctors who used the product. He stated that change was not reflected in the sales statistics. He explained that certain physicians were given less priority for calls because of the types and amounts of products ordered. He testified, and Messina admitted, he had received bonuses for his performance for every year he was employed except obviously the last year, and that included the one year (1979) in which he was placed on probation for a short time. He stated that following his probation in 1979, Messina told him he wanted to fire him but French would not let him and that he felt his evaluations were intentionally downgraded after that time. It was further pointed out in the testimony that not all of the doctors he reported seeing during the week he allegedly falsified the report were interviewed by Messina.
The testimony of the physicians and of defendants' other witnesses was often vague and inconsistent. Credibility determinations are the function of the trier of fact. Apparently the jury in this case chose to believe plaintiff's assertions that he neither falsified his call reports nor performed his job so poorly as to provide Wyeth with justification to fire him for cause. After reviewing the testimony, we cannot say the jury was clearly wrong in its factual findings. Arceneaux, supra.
Defendants next assert the trial judge erroneously excluded evidence of plaintiff's subsequent employment and termination. Defendants contend the evidence is relevant to show character, habit, fraud, intent and industry custom, and provides support that plaintiff was fired for just cause. Defendants also contend the evidence is admissible to mitigate damages. Plaintiff, on the other hand, alleges the evidence is irrelevant. He asserts the termination from plaintiff's subsequent employment occurred three years later and was for reasons totally different from his termination from Wyeth.
Character evidence should be excluded in civil cases, in particular where it is offered to prove a person did or did not do an act on a particular occasion. Gould v. Bebee, 134 La. 123, 63 So. 848 (1913). Evidence as to habit, on the other hand, may be relevant and admissible where the *169 person's conduct is repeated in enough particular instances to justify an inference based on systematic conduct. Loughan v. Firestone Tire & Rubber Co., 749 F.2d 1519 (11th Cir.1985). See also, Brumfield v. Brumfield, 477 So.2d 1161 (La.App. 1 Cir.1985), writ denied, 479 So.2d 922 (La. 1985). That is not the case here, where the alleged evidence of "habit" occurred three years after plaintiff's termination.
Likewise, defendants' contention that the evidence is relevant to show "fraud" is unpersuasive. Defendants cite Culbertson v. JNO. McCall Coal Company, 275 F.Supp. 662 (S.D.W.Va.1967), for this proposition. That holding, based on the Federal Rules of Evidence, limits the admission of such evidence to other fraud of like character committed by the same party within a close time frame. It is admissible only to show a scheme or plan broad enough to include the act in question. We do not find the evidence admissible here since plaintiff was not accused of, or fired for, fraud in his subsequent employment, and that firing was too remote at any rate to show a broad scheme to defraud his employer.
Next defendants argue the evidence is admissible to show intent (presumably an intent to mislead his employer). In order to prove intent, Louisiana law (albeit in criminal cases) requires that other acts must be similar, there must be a real and genuine issue of intent, and the probative value of the evidence must outweigh its prejudicial effect. State v. Kahey, 436 So. 2d 475 (La.1983). In this case the evidence of plaintiff's termination from Rugby fails to meet the requirements for admission of other acts to prove intent.
Defendants next contend the evidence was also admissible to show industry custom. Industry custom has no bearing on this case. Plaintiff admitted falsification of reports would constitute just cause for termination.
Finally, defendants assert the evidence was admissible to show mitigation of damages. In this respect defendants contend employees have a duty to mitigate damages in breach of employment cases, citing Carpenter v. Hartford Accident and Indemnity Co., 333 So.2d 296 (La.App. 1 Cir.1976); Rabon v. Red Ball Motor Freight, Inc., 292 So.2d 332 (La.App. 2 Cir.1974). Plaintiff, however, argues an employee with a contract for a definite term has no duty to mitigate his damages when he is terminated without just cause, citing Camp v. Baldwin-Melville Co., 123 La. 257, 48 So. 927 (1909); Hill v. American Co-operative Ass'n., 195 La. 590, 197 So. 241 (1940).
In conjunction with this argument, defendants also assert the amount awarded by the jury is excessive. Plaintiff in his cross-appeal contends the damages are inadequate. Because these contentions are related to the issue of mitigation, they are appropriately addressed here.
The jury herein awarded plaintiff $300,000 for his damages. Plaintiff's expert testified plaintiff suffered a total economic loss of $993,474.44 due to the breach of the contract. Under either LSA-C.C. art. 1995 or C.C. art. 2749, plaintiff would be entitled to full amount due under the contract. If the contract arises under the general laws of contract, plaintiff has a duty to mitigate his damages. If it arises under C.C. art. 2749, that duty does not exist. See Camp, supra. We cannot determine precisely how the jury arrived at its verdict, but a simple calculation shows the $300,000 is less than plaintiff's salary for ten years.
Whether the jury mitigated plaintiff's damages or whether it assessed the amount of damages for a reasonable limited term, (see LSA-C.C. art. 2746), we do not know. In any event the jury's award conforms to the law, and we find it to be neither excessive nor inadequate.
Defendants assert the trial court erroneously excluded evidence of plaintiff's performance in the years prior to 1982. Defendants contend the evidence was probative of plaintiff's character and habits and would provide justification for plaintiff's termination to show plaintiff's performance was unsatisfactory over a period of time. Plaintiff asserts the evidence, *170 which related to plaintiff's performance in 1976, is inadmissible for the same reasons the evidence of his subsequent employment and termination are inadmissible.
The evidence defendants attempted to elicit related to an event in the 1970s. Complaints related to plaintiff's performance in 1982 were adequately covered in the testimony. We agree with plaintiff that evidence related to plaintiff's performance in 1976 or 1977 is too remote to have probative value for plaintiff's termination in 1982. Furthermore, plaintiff testified he was placed on probation sometime during that period and defendants' witnesses admitted he received a bonus that year nonetheless. Thus we find the trial court properly excluded extensive questioning about those years.
In addition to the arguments related to plaintiff's breach of contract claim, defendants attack the defamation claim filed by plaintiff. Defendants contend the defamation claim should have been dismissed for failure to state a cause of action and/or on their motion for summary judgment.
To successfully recover for defamation in Louisiana the litigant must prove the following elements: (1) defamatory words, (2) communication to someone other than the one alleging the action (publication), (3) falsity, (4) malice, actual or implied, and (5) resulting injury. Moreau v. Brenan, 466 So.2d 572 (La.App. 5 Cir. 1985); Lees v. Smith, 363 So.2d 974 (La. App. 3 Cir.1978); Madison v. Bolton, 234 La. 997, 102 So.2d 433 (1958). Words are defamatory when they have a tendency to deprive the person of the benefits of public confidence or injure him in his occupation or when they have a natural tendency to injure the person's reputation. Cashio v. Holt, 425 So.2d 820 (La.App. 5 Cir.1982), writ denied, 430 So.2d 94 (La.1983); Madison, supra. When the words themselves have those results even without considering extrinsic facts and surrounding circumstances, they are defamatory per se. Cashio, supra; Madison, supra. If the words are defamatory per se, falsity and malice are presumed and defendant has the burden of rebutting the presumption. Cashio, supra; Moreau, supra. If the words are not defamatory per se then malice must be shown and will be found to exist where statements are made with reckless disregard for whether or not they are false. Lemeshewsky v. Dumaine, 464 So.2d 973 (La.App. 4 Cir.1985). Damages for defamation may be awarded for humiliation, loss of reputation, embarrassment, and mental suffering, even without pecuniary loss. Moreau, supra.
Available defenses to the action in defamation are truth and/or privilege. Desselle v. Guillory, 407 So.2d 79 (La.App. 3 Cir.1981), writ denied, 412 So.2d 83, 84 (La.1982). Included within the defense of privilege is the defense of conditional privilege, which consists of the elements of good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only. Cashio, supra; Madison, supra; O'Dell v. Deich, 496 So.2d 1074 (La.App. 4 Cir.1986).
In plaintiff's amended petition he asserted he was defamed through the acts of two of Wyeth's employees, representatives or agents. He further alleged that the Wyeth employees stated to employees of Charity Hospital and Steward Pharmaceutical Company that he was fired for arriving late at work, leaving work early and falsifying company records. Plaintiff contends in the petition that the statements were false and were made without substantiation and malice, resulting in damage to his reputation. We find the petition states a cause of action for defamation and for the resulting damages.
As to the motion for summary judgment, we stated earlier the motion is moot and, furthermore, was resolved satisfactorily in the defendants' writ to this court. Thus we find no need to address this contention.
Defendants next contend the trial judge erred in failing to grant defendants' motion for directed verdict and judgment N.O.V. on the defamation claim. Defendants allege the evidence was insufficient to prove defamatory words, publication, ratification by Wyeth, or that the statements, if any, *171 were the truth. Defendants also claim any statements made by Messina or French to the doctors were made in the course of their investigation and/or in preparation for trial and were protected by qualified privilege. Defendants finally assert even if the defamation occurred, plaintiff failed to prove malice or an injury and thus the award by the jury was an abuse of discretion.
The evidence shows that several doctors were informed by Messina that plaintiff was falsifying records. Dr. Dunn stated Messina told him plaintiff had been fired for "not seeing doctors" listed on his call reports. That statement was made either when Messina came to take an order for his emergency first aid kit or when the kit was delivered, but did occur in 1982. Thus this statement was apparently made prior to suit and after plaintiff was fired. Dr. Martz testified Messina told him plaintiff was not making calls he claimed to have made, and that he was "falsifying reports and spending work time in his personal pursuits." That statement was also made in 1982; however, it is unclear whether it was made prior to or subsequent to plaintiff's termination. Dr. Lain, in her testimony, stated two men visited her in 1982 and questioned her about her appointment book. (Messina testified he saw her alone in 1982 and again with French in 1985 in preparation for trial.) At that time she was told plaintiff had been terminated for falsifying reports.
Other evidence of defamation was presented by plaintiff through the testimony of Michael Szczepanski, an employee of Syntex Laboratories. Szczepanski stated he and another person were told by Gary Theriot, a Wyeth employee, that plaintiff was fired for "not working." The statement was made during a coffee break at LSU Medical Center. On the other hand, Ronald Gros, a Wyeth sales representative, stated he was told by Messina that plaintiff was fired for failing to follow company policy and that he told two other industry people the same when asked why plaintiff was fired. Messina also stated he told Gros and Theriot that plaintiff had been fired for not following company policy, although he had no valid reason to discuss it and under Wyeth's rules he should not have discussed plaintiff's termination with any other employees.
Plaintiff testified that after he was terminated he was told by several industry salesmen that his termination was the "talk of the town," and that it was general knowledge he was fired for not calling on doctors, for falsifying reports and for not doing a good job. He stated he never discussed his termination with anyone other than his family and attorneys except to say he was fired for not following company policy, when asked.
The statements made by defendants' employees Messina and Theriot that plaintiff was fired for falsifying reports and/or for not working certainly have a tendency to deprive plaintiff of the benefits of public confidence, to injure him in his occupation and/or to injure his reputation. Contrary to defendants' assertion, not only were the words defamatory, but they were defamatory per se since those results would occur without considering extrinsic circumstances, and thus malice is presumed.
Furthermore, although several of the statements made to doctors may have been protected by qualified privilege, those made to Dr. Dunn, Szczepanski and possibly Dr. Lain were outside that protection since they were made after the investigation ended and prior to filing of suit. In addition the defamation is imputable to defendants since the statements were made by the employees while acting within the course and scope of their employment, and were ratified by defendants as shown by the facts. Ardoyno v. Ungar, 352 So.2d 320 (La.App. 4 Cir.1977), writ denied, 354 So.2d 210 (La.1978). See also, LeBrane v. Lewis, 292 So.2d 216 (La.1974).
As to whether or not the statements were true, the content of the statements was emphatically denied by plaintiff. Coupling that denial with the inconsistencies in the testimony of defendants' witnesses, it is more probable than not that the allegations were false. Consequently *172 we find no error in the trial court's denial of defendants' motions for directed verdict and judgment N.O.V. We likewise find the jury was not clearly wrong in its finding that plaintiff was defamed by defendants.
Defendants assert that even if the defamation occurred, plaintiff failed to prove an injury. Defendants contend the only evidence of plaintiff's injury is plaintiff's testimony and that the testimony is insufficient to prove injury. Defendants conclude that the award by the jury was thus an abuse of discretion.
As we stated earlier, damages are awarded in successful defamation cases for humiliation, loss of reputation, embarrassment and mental suffering, even without pecuniary loss. Moreau, supra. In determining the award the following factors should be considered by the trier of fact: "the severity of the charges, the motives of the defamer, the position of influence enjoyed by the defendant and the extent of the publicity which was given to the defamatory statements." SAS Jaworsky v. Padfield, 211 So.2d 122, 127 (La.App. 3 Cir. 1968); Moreau, supra. Calculation of those damages is within discretion of the trial court and will not be disturbed absent an abuse of discretion. Moreau, supra; Reck v. Stevens, 373 So.2d 498 (La.1979). In addition, when the words are defamatory per se injury is presumed. Chretien v. F.W. Woolworth Company, 160 So.2d 854 (La.App. 4 Cir.1964), writs denied, 163 So.2d 356 (La.1964).
In this case, the presumption of injury is supported by plaintiff's testimony as follows:
"Q. Would you explain to the jury what kind of mental distress and anguish you've suffered?
"A. Just the humiliation or the frustration and you have to be there yourself to know that after knowing people for all these years and developing a reputation that was beyond reproach all of a sudden everybody wants to know what's going on and everyone is talking aboutyou've all of a sudden become untrustworthy. Everything you've built for 18 years is just gone. It's destroyed and it's really humiliating and it hurts."
The jury was apparently impressed with plaintiff's testimony, his demeanor and the fact that the management and at least one employee of defendants made the remarks to physicians and other members of the industry. Plaintiff asserts the jury was further influenced by the disdain exhibited by those physicians toward plaintiff in their testimony. Whether or not the doctors exhibited such disdain, the jury was clearly impressed that plaintiff suffered great humiliation and embarrassment from the defamation and that his reputation was harmed to a great extent. After reviewing the testimony of all the parties in light of the factors listed by the Jaworsky court, we find the charges of dishonesty and laziness were severe, the motives of the defendants suspicious, the publication extensive, and that plaintiff enjoyed a certain reputation for trustworthiness in the industry prior to the defamation. Considering these factors, we cannot say the jury abused its discretion in its award of $250,000 to plaintiff.
Defendants next contend the trial court erred in failing to grant a directed verdict and judgment N.O.V. on the dental benefits claim. Defendants further assert the amount awarded ($350) was an abuse of discretion.
Plaintiff contended he incurred $350 in dental expenses following the termination. He stated the dental bills were for ongoing orthodontic work on his children. He asserted that under the terms of the insurance benefits provided to employees he was entitled to payments for dental work for 90 days following his termination.
Defendants' witness Robert Conti, supervisor of employee benefits for Wyeth, stated no amounts were due to plaintiff and that all claims had been paid. He further contended that benefits ended at the end of the month the employee leaves the defendants' employ, but on cross-examination admitted the "book" provided payment of benefits for three months following termination. *173 At any rate he explained that the insurer, Metropolitan Life Insurance Company, made all decisions related to payments and that Wyeth's refusal to pay on demand by plaintiff was justified. He further stated that one $50 payment was made to plaintiff three years following plaintiff's termination, after he spoke to Metropolitan regarding plaintiff's demand that he was due additional dental payments.
Following submission of the evidence in regard to the dental benefits, the jury concluded plaintiff was entitled to $350. After our review, we find no abuse of the jury's discretion.
Defendants' final assignment of error involves defendants' stock option plan for its employees. Defendants assert plaintiff was not entitled to the option because he was fired for gross misconduct. Defendants alternatively contend the jury erred in awarding plaintiff $40,000 for breach of the stock option plan.
The defendants provided its employees with the option of purchasing company stock at a fixed price (which was $27.75 per share in plaintiff's case). The evidence further shows that terminated employees are entitled to exercise the option within 90 days of termination. The exercise of the option is not permitted, however, if the employee is fired for "gross misconduct," or if the employee voluntarily resigns from his employment. (Notably, Messina attempted to convince plaintiff to sign a waiver of his option rights at the time he was terminated.) Regardless, the evidence shows, and the jury found, plaintiff was fired without just cause, and thus was wrongfully denied his right to exercise the option. The only question remaining is whether the amount awarded was an abuse of the jury's discretion.
Defendants contend the evidence does not support the award because plaintiff only attempted to buy 10 shares in November 1982 and not the full 390 he was presumably entitled to buy. Thus, they assert the award should be limited to those 10 shares and that he should only be allowed to recover $100. That figure was derived from the price of stock on the day plaintiff attempted to exercise the option, considering the immediate resale of the stock and taxes on the gain from the purchase and sale. Defendants further assert the $40,000 was above the figure calculated by plaintiff's counsel for the 390 shares and does not take into consideration taxes plaintiff has to pay on it or the cost to plaintiff of borrowing money to purchase the stock. Further, defendants contend the measure of the damages is from the date of the breach. C.C. art. 1997, et seq.
Plaintiff testified he only attempted to purchase 10 shares because defendants had already disputed his other claims. He explained he could not tie up $10,000 for the full 390 shares if they refused to allow him to exercise his option. Further plaintiff stated had the defendants allowed him to buy the 10 shares he would have immediately exercised his option on the remaining 380 shares. Plaintiff also asserts the breach was in bad faith, and thus he is entitled to recover all damages, foreseeable or not, that are incurred as a direct consequence of the breach. LSA-C.C. art. 1997. In support of the jury's verdict plaintiff also points to the testimony of his witness George Crane, a stockbroker. His testimony was introduced in order to assess the value of the stock and plaintiff's loss. He quoted the high and low closing prices of the stock on the day plaintiff was fired ($17.37½), on the day he attempted to exercise his 10 shares ($45.25), and on the date of trial ($76.87½). He also quoted the highest closing price for the stock which occurred in August 1986 ($94.87½).
Calculating the profit plaintiff would have received had he exercised his option and sold the stock on those various days, the figures are well below the $40,000 awarded by the jury. However, the plaintiff stated he still retained shares of stock he purchased some years previously while still employed at Wyeth. The jury may have been impressed with the fact or may have believed that Wyeth acted in bad faith.
When damages are insusceptible of precise measurement, much discretion will be left to the trier of fact for the reasonable *174 assessment of damages. LSA-C.C. art. 1999. Furthermore, a bad-faith obligor is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. C.C. art. 1997. After our review, we cannot say the jury abused its much discretion in its award for the plaintiff's stock option rights.
Accordingly, we hereby affirm the judgment of the trial court. Costs of appeal are to be paid by appellant.
AFFIRMED.
BOWES, J., concurs in part and dissents in part with reasons.
BOWES, Judge, concurring in part and dissenting in part.
I agree with the conclusions reached by my learned colleagues in the beautifully-written majority opinion, except one. I cannot agree that the jury's award of $250,000 for defamation is proper. In my view, it is very excessive and a great abuse of the jury's discretion.
I base my opinion on a history of cases. Generally, cases in which an award in excess of $100,000 has been granted have been instances where the plaintiff who was defamed was subjected to extensive public attention. Examples of these are:
1. McHale v. Lake Charles American Press, 390 So.2d 556 (La.App. 3 Cir.1980); Cert. Denied 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). Here, an award of $150,000 was deemed appropriate because defamatory words were in a newspaper with a circulation of 35,000.
2. Health Unlimited v. Loyola University, 434 So.2d 133 (La.App. 5 Cir.1983) Writs denied 435 So.2d 445 (La.1983). Trial court awarded plaintiff $150,000 against defendant television station for segment which aired during 6:00 p.m. newscast. Reversed on other grounds.
3. Kidder v. Anderson, 345 So.2d 922 (La.App. 1 Cir.1977) writ issued 346 So. 2d 1271Reversed on other grounds 354 So.2d 1306 (La.1978); Cert. denied 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978). In this case, an award of $400,000 was reduced to $100,000 in a defamation action by the acting chief of police against a newspaper.
4. Walker v. Associated Press, 191 So. 2d 727 (La.App. 2 Cir.1966); writ granted 194 So.2d 99 (1967); Reversed on other grounds 206 So.2d 489 (1968). Cert grantedReversed on other grounds 389 U.S. 28, 88 S.Ct. 106, 19 L.Ed.2d 28 (1967). In this instance, an award of $2,250,000 was reduced to $75,000 in an action by a plaintiff against a newspaper.
In other defamation cases with claims similar to the one here, the awards have generally been in a much lower range; see Moreau v. Brenan, 466 So.2d 572 (La.App. 5 Cir.1985); Plaintiff awarded $1,000 for defamation action where wife was alleged to have had extra-marital sexual relations. Bessie v. K-Mart Apparel Fashions Corp., 472 So.2d 251 (La.App. 1 Cir.1985). Trial judge granted remittitur reducing jury award of $10,000 to $1,000 in malicious prosecution and arrest action. Upheld in the court of appeal.
I agree that the majority correctly states the elements to be considered in an award for defamation as established in SAS Jaworsky v. Padfield, 211 So.2d 122 (La.App. 3 Cir.1968). They state further that "... the jury was clearly impressed that plaintiff suffered great humiliation and embarrassment from the defamation and his reputation was harmed to a great extent."
However, I find in this case that the plaintiff suffered little ill effect from the defamation. I could find only one statement in the record made by the plaintiff to indicate the extent to which he was harmed based on personal humiliation, embarrassment and mental anguish and suffering. This statement is quoted in the majority opinion as follows:
"Q. Would you explain to the jury what kind of mental distress and anguish you've suffered?
"A. Just the humiliation or the frustration and you have to be there yourself to know that after knowing people for all these years and developing a reputation that was beyond reproach all of a sudden everybody is talking aboutyou've all of a sudden *175 become untrustworthy. Everything you've built for 18 years is just gone. It's destroyed and it's really humiliating and it hurts."
I do not believe the facts bear out plaintiff's testimony. It is apparent to me that his personal reputation could not have been injured very much because he obtained a similar position in the same industry within a very short time of his dismissal from Wyeth. This being so, it does not seem to me that the humiliation he testified to justified an award of $250,000.
I am aware that the amount of damages to be awarded in a defamation case is left largely to the discretion of the trier of fact. SAS Jaworsky v. Padfield, supra. Although there is some proof in the record upon which the jury could award Mr. Brannan damages for loss of reputation, personal embarrassment, humiliation, mental anguish and mental suffering, the facts and circumstances of this case indicate to me that the jury greatly abused its discretion in awarding him one quarter of a million dollars for these items, in addition to the other awards given him, amounting to approximately $340,300. Accordingly, I would reduce the award for defamation to $25,000.